The first argued case on the calendar, numbers 20, 38, 16, 20, 40, 20, 20, 40, 99, ABKCO Music v. Sagan. Mr. Elkin. Elkin. Claimant interpreter. Fight Law Complaint to the defense with the court's permission. Two minutes for revoked. For more than a century, the Copyright Act has permitted a person who has authorized to copy a musical recording the right to a statutory license to use the underlying musical composition. The district court below denied appellants the right to that statutory license by misinterpreting the statute, the novel, and its supported rulings. Time permitted, I plan to address three distinct errors the district court made on summary judgment. First, the district court found that appellants did not have a compulsory license to stream music in the absence of a former consent, and because the musical recordings were captured by a video recorder. And so finding the district court misinterpreted pertinent provisions of the copyright statute. Secondly, the district court failed to submit to the jury disputed material evidence pertaining to appellants' defenses of applied license and estoppel and, to the extent relevant, the issue of lawful fixation. Third, the district court improperly found individual appellant William Zagan directly liable for copyright infringement without any proof of volitional conduct and by applying standards reserved for vicarious copyright infringement. Secondary copyright infringement claim not pledged in case. Turning to the section 1.5 compulsory license provisions. Can I ask about something you mentioned, which is about the question of whether the recordings were fixed lawfully? I understand you have an argument that you don't even, that requirement doesn't even apply to you, but there seemed to be agreement that if it did, fixed lawfully would require the consent of the performer to the initial fixation. Is that right? But the district court cites the federal anti-bootlegging statute and the New York State anti-bootlegging statute. And both of those statutes were passed in the 1990s. I mean, so do you agree, was there a law in the 1970s that prohibited the recording of musical performance without the consent of the performer? There was not, Your Honor. The anti-bootlegging statute 1101, for example, was passed in 1994. So is then your position that anybody could have recorded the concerts in the 70s without getting the consent of the performer? That's not what our position is, to be fair. I can conceive of circumstances in which an individual might surreptitiously or copy certain music. That's not the facts before the court. But yes, Your Honor, there is no, there was a gap in the law with regard to the extent Right, so then when we talk about whether it was fixed lawfully at the time, and the district court cites these statutes that were passed much later than the initial fixation of these recordings. So what's the basis for that, for the idea that you needed the performer's consent at the time of the recording? I guess in other words, why aren't you, you just said that's not your position. So why isn't that your position? What is the source of the law that would mean that the recording wasn't fixed lawfully because it didn't have the performer's consent? Well, I think the issue as to what was meant by fixed lawfully, as Your Honor will notice, our position is that if a person was fixed by a precedent or an interest, we step into I know, you're saying that it's not fixed by another. Right. But my question is, even if it were fixed by another, what makes it, why is the fixed lawfully requirement, why does that depend on the performer's consent? What's the source of law that requires that? I don't think there is, Your Honor. I don't think there is any statute that actually imposes that requirement at all. But you didn't argue that. You didn't say that, notwithstanding the performer's consent, the lack of consent. Even if the performance did not consent, it still would have been fixed lawfully. Well, it would have been a different issue if you'd said it didn't apply at all. But you're saying that the fixation was required and it was by consent by a predecessor. Right. And that's the argument you're presenting today. Right. Your Honor, there are two arguments. One, of course, is that the statute imposing fixed lawfully doesn't apply to us because of the fact that the warnings were made by our predecessors in interest. Well, except that your predecessors in interest would have had to have had the consent. Right. Your position is that because it's your predecessor, it was not, in fact, fixed by another. It was fixed by you, and so, therefore, that provision doesn't apply to these recordings. That's correct, Your Honor. But, you know, you did— That would be an interesting interpretation because that would encourage the bootlegger, right? Well— I could go and record something at Philmore East back in my younger days, since I remember Philmore East in my younger days, and then I could sell it to you, and you could put it up on a website. Well, the facts of this case are completely different, as your Honor knows. Well, no, stick with me because you're here with me. Stick with me. In your hypothetical, which is far removed here, I can see how there could be, if the Statute 1101 were in existence at the time of the actual recordation, there would be remedies that the performer would actually have to be able to object, but notwithstanding that, you could only have a compulsory license if you have the right to use the underlying sound recording itself. So there are two traps that really have to be run by any copyright. Well, also, it would be the case, because the requirements do only apply to recordings fixed by another, that if I were bootlegged, if I went and recorded a concert and I distributed my own recording that I myself fixed, my own bootleg, there just wouldn't be an argument that that provision would apply, right? Correct. So there still would be lots of bootlegging. So, like, that's kind of a weird way for the statute to get at a bootlegging problem, if it only applies when somebody is using somebody else's bootleg but wouldn't apply when somebody has their own bootleg that they're distributing, right? Well, there always was a gap in the law before 1994. This country didn't have moral rights, and so it was a completely different set of issues that were addressed by people who were around. But the issue of local fixation, even if it applied to us, the facts of this case are very compelling that, in fact, you have, in a sense, you have all of these recordings were done in the open. We have Mr. Hewitt's testimony. Isn't it uncontested on this record that there's no issue as to whether your predecessor in interest complied with 115? Your Honor, we don't think there's any issue at all with regard to that. We have persons. There are so many different sources. So if there's no challenge to whether your predecessor in interest complied with 115 or had to comply with 115, then the only question is whether your predecessor in interest is an other or not. Right. So our clients, our predecessors in interest, were underdog the act of making the recordings itself. They didn't have to comply. I mean, you keep saying predecessors in interest, but, you know, in some cases, I suppose you acquired the entities that did the early recordings. But sometimes you also just bought the recordings from other entities. Right. So if I buy something from another entity, we don't become the same entity and that person doesn't become my predecessor. Right. Isn't that a weird way to talk about another? Like, why do you become the successor to an entity if you just bought a physical object from that entity? It's a basic one-quote law with regard to property. We acquired the bundle of rights associated with the assets that our clients acquired. So that's right. So if it said something like a sound recording owned by another, maybe it wouldn't apply to you because you bought the sound recording. But isn't it hard to get over the language that says fixed by another? I mean, isn't it pretty obvious that some other entity fixed these recordings? But why is that? You know, for the vicarious liability question, you talk a lot about respecting the corporate form and that Mr. Sagan did something as part of a corporate entity and not in his own personal capacity. But here you're saying we should ignore the fact that these are two different entities that made the recording and then wanted to distribute the recording. I don't want to get into that. I'm just saying, like, you understand the idea about corporate formalities. Like, you didn't become the other entity that made the recording. We did not become the other entity, but we succeeded to the interest of the client. But when your client bought these items, the entities that you were describing as predecessors in interest did not claim that they were selling you a bundle of rights. They were basically saying these are coming to you without any rights. SA-1139, agreement with Milgram Enterprises. SA-1518, Kingfisker Entertainment. SA-1519 with Festival Network. All of those agreements specifically lay out the notion that these sound engineers made these recordings themselves and they specifically said that they had the performer's consent. That gives at least some evidence from which a trier of that would be able to... Well, they also say that to the extent that we have intellectual property rights, we transfer them and they just weren't sure what rights they actually had, right? I mean, that's another... It's not what they said, Judge. What they said, Your Honor, is the fact that these were recordings that they personally made and number two, that they secured the performer's consent at the time of the recordation. Our clients entered into those agreements with those sound engineers, those vendor operators, those concert promoters. They succeeded to those interests? Well, there is all of this language that says we make no representation about intellectual property rights and so on, right? Only one. There was one agreement, Milgram Archives, which comprised about 15% of the recordings. But even with respect to the Milgram Concert Series, even with respect to those, there is no question that the concert promoter and the sound engineers made those recordings. So to the extent that we succeeded to those recordings, there is... Wait, can I ask you a question? Can I ask you a question about you said when you were making an opening statement that the district court denied you compulsory licenses under the statute. But are the HFA licenses compulsory licenses under the statute or are they licenses that you have negotiated with the counterparty? With regard to the HFA licenses, they acted as an agent for the actual principal publishers and they were free to be able to negotiate terms directly with our client. The other side's position in the district court held that it didn't matter in that particular instance because they were negotiating on compulsory rates. Our view is that it doesn't matter. In the circumstances, they were the agent. Right. So then they're not compulsory licenses. They're negotiated licenses. That's right. That you got. Right. But then there's some question about you stopped relying on them in 2013. Is that right? We didn't stop relying on them. What happened was that, according to the facts of the record, Harry Fox stopped administering payments. So we were forced to go to the Vegan Act and write a loan in order to be able to properly account to the principal publishers. We continued to rely, based on the record... On those licenses. So your position is that the NOIs were not necessary but were like backup licenses. Is that right? That's correct, Your Honor. And what about the district court's argument that the HFA licenses nevertheless incorporated the terms of the statute? So even if you wouldn't necessarily have to abide by the statute directly, the HFA licenses said, I mean, in that e-mail you got from HFA, it says you have all of the obligations that a licensee would have under the statute except as the agreement explicitly departs from it. That was a form letter. And this court noticed in the Rodgers v. Hammerstein case that the circuit decided that Harry Fox is considered to be an agent for the principal publishers. We negotiated with them on behalf of their respective clients. And our position, of course, is that they were the agent. We were entitled to rely on those licenses. Our client wanted to give the money to the publishers, which is why we had to go to these other entities. Well, you could rely on the licenses, but maybe the licenses still incorporated the terms of the statute, right? I mean, maybe the argument then is different because maybe then it's not a violation of the statute. It's a violation of the breach of a licensing agreement that you had, and maybe that should change the analysis, but it doesn't seem like you made that argument either. Our current argument position is that the issues with regard to defense and estoppel key off of, to a degree, the licenses that we ultimately had with Harry Fox. In addition to that, you know, there are so many other instances of copyright registrations on file. There's a high-profile litigation that ensued much earlier with regard to all of the sister record companies where the 1101 claims were mitigated and resulted in agreements, whereby those agreements ultimately provided that those sound recordings were authorized. That's the bottom line. Are you seeking a new trial? Yes, Your Honor. All right. All right. Unless there are other questions, you have reserved time for rebuttals, so we'll hear from you again. Thank you. Let's turn to the Akeli. Mr. Slotnick. I know there's no rebuttal for the Akeli. Oh, that's right. There's a cross-appeal. Sure. We'll let you have one minute. Yeah. I'd like to address a number of things that Mr. Elman talked about that the Court can't correctly acknowledge. The defendants did not acquire any bundle of rights. They required material objects. Those material objects, they have absolutely no rights. The defendants were told, as you say, it was told personally by his first vendor, you're buying a personal collection of material. If you want to exploit them, you need to get the sets from the publisher. But the district court didn't really rely on the idea that they were getting a bundle of rights, or whether or not they were getting a bundle of rights from the concert promoters. The idea was that it's not lawfully fixed unless there was consent to the concert promoters to record the concerts in the first instance, right? Well, correct. And so I guess I have the same question, which is the district court cites these anti-bootlegging statutes that were passed in the 1990s. Was there a law in the 1970s that made it unlawful to record a musical performance without the consent of the performer? There was, I think, at the time, in the early 1970s, there were approximately 42 states that had anti-piracy statutes. But in New York... Well, piracy is different than bootlegging, right? Piracy is about reproducing somebody else's recording. It doesn't make it unlawful to record a musical performance in the first instance, does it? The common law is that in New York, there's Metropolitan Opera, there's Wagner, there is... Right, those are those cases that you cite in the footnote in your brief from the 30s and the 40s, right? I think 30s, 40s... And 50s, maybe. Right. But that seems to be about producing, duplicating recordings and making money off of it. I mean, does it actually stand for the proposition that it's illegal to do the first recording even if you're not going to commercially distribute it? Yes, I believe Metropolitan Opera was just that kind of case where it was radio programming. So it wasn't public performance, which was not authorized by the authors. But wasn't it also the case that you couldn't have a copyright on something unless there was another fixed work, right? So unless the performer had fixed it somewhere, they couldn't own a copyright in it. Well, with respect to sound recordings, there was no copyright until 1972. But there was always a common interest in the authors having... All right, so you're saying that's what makes it unlawful to have fixed it in the 70s. But the district court didn't say that, right? The district court invokes these anti-blue-legging statutes from the 1990s. And we don't... There is no discussion about the state of the law in the 1970s when the thing was initially recorded. But now you're telling me, what, that we should look at the common law of New York in the 1970s to say that's the reason why these recordings were not lawfully fixed? Well, we're saying, first of all, that they weren't lawfully fixed because they were audiovisual works and audiovisual works are... No, no, no, that's a separate question, the audiovisual works. But for just the sound recordings, the reason it wasn't lawfully fixed is because of the common law of New York in the 1970s. So in 19... When we were litigating this case in the 2020s, the issue was whether or not these works were lawfully fixed. Lawful fixation requires consent of the artist. They have no consent of the artist. But that's the question. I was asking, why does lawful fixation require the consent of the artist? And you told me it's because of these common law cases from the mid-century, mid-20th century. Well, I think that even if you move to the present day, at the time these recordings were made, they were made without the authorization of the artist at all. That the artists are deemed to be the owners of the copyright in those recordings. In any event, in front of the district court, you asserted a copyright interest in the recording, the audiovisual recordings and performances of individuals whose interests you hold now as publishers, correct? No, we claim copyright only in the underlying musical work. All right, so you claim that. And the defense against it was that they held proper licenses in accordance with either fixation or some other statutory defense, correct? Correct. There was no defense that there was no common law right with regard to the recording of a public performance? It was.  Correct. All right. And so the playing field with regard to this case as cast by both of you is in the context of the statute and its interpretation as to fixation and who's responsible for it. Correct. All right. If this is tried, summary judgment is determined on that. And the argument about the fixation is interpreting the statute and its terms as opposed to that of its non-applicability. Correct. All right. Sir, Your Honor, again, you asked about Harry Fox licenses. Harry Fox licenses are not negotiated licenses. They are merely written variations of compulsory licenses. Well, how could that be? I mean, the email from Harry Fox says the provisions here vary the terms of the compulsory license provision of the Copyright Act, right? And then it has an offer. It says, making and distributing of interactive streams with limited downloads of any such musical work shall constitute dissent to these terms. Right? So there's a they present terms. There's like an offer of terms, and there's an acceptance by engaging in the distribution of the streams, right? Well, case law in this circuit has been for decades that a Harry Fox license is merely a variation. And the variations in that license are there to benefit the license. Right. It's a variation because the agreement does adopt terms of the statute by reference, but it's doing that as part of a contract between the copyright holder and the counterparty, right? No, Your Honor. It is not a contract. It is a... Well, then how can it vary the terms of the statute? It varies the terms of the statute sometimes by rate, sometimes by... Right, but if it were a statutory license, you'd have to follow the statute, wouldn't you? Except words vary. Right, but the reason you can vary from the statute is because you have negotiated a license independent of the statute, right? It still does not take away from the fact that this constitutes a statutory license in a slightly different form. For example, if one bans... I mean, did Congress say in the Copyright Act the Harry Fox agency is authorized to issue compulsory licenses under the statute and can vary the terms of the statute in accordance with the negotiation with the licensing? Congress hasn't said that, but for the better part of 60 years at least, courts in Histolia and elsewhere have said that if you don't pay royalties in accordance with the Harry Fox licensing, you're not breaching the contract, you're a copyright infringer. So based on that, this is simply a variation benefiting mostly... Have we said that? I think it was Joy v. SICO going back, I think, to the 50s. There were a number of cases that talked about this as being a variation of the license. But you understand my point that if the Harry Fox agency can depart from the statutory requirements, it's hard to see how that is an application of the statute as opposed to a negotiation between the Harry Fox agency and the licensee, right? Well, I beg to differ. I think that the courts have basically said it is simply a variation. It is not a negotiated agreement. And, I mean, what Your Honor is suggesting is if someone just signs that form without any negotiation of any of the variances of the terms, then that would be an infringement, but otherwise it's a contract. In the 50 years that I've been practicing, I've never seen a breach of contract case brought on a failure to pay up for a Harry Fox license. It is a copyright infringement. It's an act of infringement. In any event, the defendants didn't meet any of the requirements of a Harry Fox license or any other license because they filed their NOI's months or years after they... Well, one of the terms by which the Harry Fox agency varies from the statute is it says you don't need to file an NOI, right? That's an express term. Well, that's correct. Right, so they wouldn't need to file an NOI by any particular date if they were relying on an HFA license. If they were relying on an HFA license, which they stopped paying on in 2013. So one way or another, they stopped relying on that license. They started relying on other licenses. Well, they relied on another mechanism to pay their royalties. That doesn't mean that the license disappeared, does it? It does if they don't pay. Well, that would be a breach, although I understand that's our other conversation about whether you think it's a breach or you think it's a violation of the statute. Correct. But the license existed, right? But you're saying that the license would have disappeared by their failure to pay their royalties. I guess we're... First of all, I do want to make clear that if a license disappeared, the license disappeared with respect to audiovisual arts are clearly outside the scope of an HFA license, a compulsory license, or any other license. Defendants were told from day one, from their own vendors, that you need a license from the publishers and you need lawful consent. They didn't get them. What they needed was a synchronization license, which varies significantly. And we want to talk about variation. A synchronization license requires going song by song, publisher by publisher, getting a negotiated dollar rate rather than a... What gets synchronized in a synchronization? What gets synchronized? What gets synchronized? The music with the audiovisual... Well, if there's a live performance... I'm sorry, Your Honor? If there's a live performance with a live person standing there singing, there's nothing to synchronize. Well, of course there is, Your Honor. There is a termed phono record, which is what phono, which is what covered by 115, only applies to sounds only and not sounds... Yes, I understand. I mean, a visual image. The synchronization, Your Honor, what Your Honor is suggesting is for example, but I think it's a concern. I'm not suggesting... I'm just asking. I mean, it seems to me that when you have a motion picture, you are synchronizing the music or the sound effects with the action that is taking place in the video, but when you're recording a live performance of something, I'm not sure what there is to synchronize. Well, why is there a difference between a live performance as a concert and for example, Judy Garland singing Over the Rainbow on the sound stage for The Wizard of Oz? According to your definition or what Mr. Elton has been saying, that's not a synchronization, and that would constitute a phono record. However, if somebody made a mistake and Ms. Garland had to re-record the song later on in a studio, that would not constitute a phono record. That just seems to be a rather outlandish way to look at what a phono record is when the single language of the statute says a phono record is something that does not accompany the visual image. So the word synchronization is never used in the copyright, not once. They talk about accompanying things. So what is the basis in the Copyright Act of the synchronization license? So what's the right that's being infringed when somebody lacks a synchronization license? The right to reproduce. The right to reproduce what? The music. The music is being reproduced. No, I understand, but that also is why you need a mechanical license. So it depends on the form in which it's being reproduced. So if I whip out my phone at a concert and I film the concert, and so I have the audio and the video recording on my phone, you're saying that's not a phono record. Correct. So what is it? It's a copy? It is a copy. And so you need a separate license for that. You do. Again, within the context of all of this, one thing— But then if I take the audio off of that recording, then I've made a phono record from the copy. You're taking the audio off? Yeah, if I strip out the video and I just use the audio after I've made a video, then it becomes a phono record. Yes, arguably it would. Right. But so then, given those definitions, it actually just is the case that if you have Judy Garland singing and you record both the video and the audio at the same time, then by your definition that's not a phono record. But if you do an audio recording on a soundstage and then a separate video recording, then you've created a phono record and also a copy, and then they're synced up later. So there's like sort of curiosities in how the statute works either way, aren't there? Well, I think, you know, let's start with the premise that 115 is an exception to the exclusive rights of a copyright holder and should be narrowly construed. But once you get past that, everything else I think falls into place. This is a copy. This is a copy that the defendants are trying to sell without a license. With respect to that unauthorized use of that copy, this does not fall within the definition of Section 115. So what is that section getting at when it says you can't duplicate a recording made by another? So we talked about bootlegging with the opposing counsel a moment ago, and it does seem like if I bootlegged a concert and then I wanted to distribute my bootleg of the concert, that wouldn't apply, right? Because there wouldn't be fixation by another. I would have done it. So isn't that a very weird way to get at bootlegging? Isn't the point of the statute piracy when I'm trying to copy some recording that somebody else has put into the public domain? So I think there's no denying that when the statute was passed in 1976, that the aim of this section was to deal with piracy and try to hide under bootlegging as well. This by and large is— Well, as we just said, the bootlegging and anti-bootlegging section wasn't passed until 1994, so it's sort of weird to think at this time they were thinking about bootlegging. Well, record companies cared about piracy. Publishers cared about both piracy and bootlegging. But they always had a right to sue anyone for using their musical composition without a license. With respect to 115, they knew that if somebody did not comply with respect to audio only, they had an absolute right to sue for copyright infringement. They knew that if it was an audio and visual work, then 115 is out of the question. It's not relevant. 106 is relevant, but they had exclusive rights to reproduce and distribute a work. Defendants didn't have that right. It was an audiovisual work. I'm sorry. I think we've gotten a little far afield. But you said a moment ago that you think Congress was thinking primarily about piracy. And so I guess my question is this. Since in this case the defendants actually purchased the recordings, it does seem like it's outside the realm of piracy where you're copying some other work that somebody else put into the public domain. I'm not sure if I followed it. Whatever rights that they had are rights that emanated from the producers, the promoters of the copies. Those promoters had no rights to anything other than the physical object. If you look in Section 101 of the Copyright Act, phonorecords specifically includes the material object. Sound recordings specifically does not include within the definition the material object. What the defendants bought were material objects. And even the word fixation, which is defined in the statute, is fixation with the consent of the author. The only authors here were the performers who sang the song and the songwriters. I have one other question, which is just about your point about audiovisual works being excluded. So the statute says you can't get a compulsory license or the phonorecords include sounds other than those accompanying a motion picture or audiovisual work. But you have also in the copyright statute the definition of digital music recording, which says a material object in which are fixed in digital format only sounds. So if Congress really wanted to just say the definition of phonorecord is only sounds, couldn't they have just said only sounds like they did elsewhere? Like shouldn't accompany a motion picture or audiovisual work, doesn't that – might that not mean something different? I don't think so, Your Honor. I think that they – I think they – I don't want to set the issues to Congress, but I think they said it clearly enough. Whether they could have said it more clearly, question for Congress. But I think it is very clear that a phonorecord does not include any visual element. But you don't think that the definition of phonorecord would be any different if, in fact, they used the language they used in the definition of digital music recording where they said contains only sounds? You're saying we should read the accompany language to mean only sounds? Exactly. Okay. All right. Well, thank you, Mr. Slotnick. We'll hear from you back – we'll hear from you for one minute on a surreptitial, but now we'll hear from the appellant, Mr. Elkin. Thank you, Your Honor. I just want to focus for a moment on the last discussion on phonorecords and audiovisual. As the panel well knows, we focus on the last sentence of the definition of phonorecords in Section 101. The term phonorecords includes the material object in which the sounds are first fixed. There's no dispute here that the recordings in question were first fixed by videotape. Our position is that it shouldn't matter whether it's audiotape, videotape, multi-track device. Is that argument that in general it wouldn't be a phonorecord if it had videotape, but since that's the object in which it's first fixed, then by virtue of that sentence it becomes a phonorecord? Is that your argument? I think it fits squarely within the last sentence of that definition, Your Honor. It doesn't matter, it doesn't specify the device. The issue is where it's actually captured. And the issue that was just— But what about the sentence before that, material objects in which sounds other than those accompanying a motion picture? There's Judy Garland for you. Or, excuse me, or other audiovisual work. Well, so you can't read one sentence to exclude the other, can you? Your Honor, I was just getting to that. Thank you. The first sentence itself talks about accompanying a motion picture or other audiovisual work. Our position— Like a videotape. A videotape of a performance, which includes just audio and visual. That's kind of simple English, isn't it? Well, I think you disagree. Okay. Because of the fact that— I would suspect you would. Because of the fact that all of the examples, movie, television, commercial, where you're actually synchronizing the sounds itself with the motion picture, we think that's— It doesn't even discuss this first sentence, this issue about first fixation. We don't have to get to the legislative history, but they— So why don't you have to get to the legislative history? So it says, So what's your interpretation of that language that doesn't encompass this recording? I would have thought you would say accompany implies something like they're separate and brought together. Is that your argument? It's not accompanying because the recording itself, the Judy Garland example for a moment, you have the video, the visual images, and the sound recording that are intertwined. They're inseparable from the moment of fixation. The notion that somehow you would have to exclude that as a photo record because the way in which it was recorded, the way in which the sound recording was recorded also picked up images. Our position is that your honor doesn't accompany it. It's first fixed along with it. We think the legislative history supports that view, but I think at the end of the day, there would be no need— Can you give me an example of what you're talking about? Sure. I mean like Gene Kelly dancing. Okay, so they put the music in later. Judge Jacobs, former Chief Judge Jacobs, is asking those kinds of questions. But when you're recording a performance, there is a sound line that the device picks up, and there's an audiovisual line that the device picks up, and it merges the two, and it produces one thing, a master tape, an audiovisual master tape. How is that not an object? It's clearly an object, but the statute itself doesn't negate the actual medium that actually captures the sounds. If it did, the statute would go on to read something like the term photo records includes the material object, which the sounds are first fixed as long as it's first fixed in an audio recording object. It doesn't say that. So I guess your position is that if you recorded Julie Garland singing the song directly on video, that would be a phonorecord because that would be the time that you first capture the audio. But if you have a video of her, and then she records the thing, but then it would accompany it if you had a video that you later added the audio to. Correct. That would not be a phonorecord. Exactly. Just like with this Cordell and Addo versus Stellar Music, where you actually had video there merged. Does that make sense, though? I mean, so if you're going to record Judy Garland directly singing in the movie as opposed to adding an audio track to it, you don't need a synchronization license under your theory. But if she records it on a soundstage and then you add it later, you would need a synchronization license. Is that your position? Yes. And how do you deal with dubbing, which is very common? In the movies, someone is singing. They don't have any voice, so somebody's voice is dubbed in. I mean, this is getting baroque, complicated, and it's hard to believe that these are principles that would govern something where licenses are necessary for the industry to function. I think in that instance, we were actually interspersing sound recording into visual images. That is something that would be accompanying sounds. It would be accompanying a motion picture. Yes. So that's pretty remarkable, isn't it? And so you're saying that if I'm making a movie and I just have the actors sing whatever song I want to use directly into the camera, I don't need to get any special license for that. I could just use whatever music – or I guess I could get a mechanical license for that, is what you're saying. I think there are two issues. I think we're conflating the actual consent with respect to the exploitation and the issue of whether something qualifies as a photo record. But in answer to your question, Judge Bonacci, I think that if the notion that a recording is picked up by a device in its first text, the notion that it has visual elements incorporated into it in and of itself wouldn't take it outside of the definition of a photo record under Section 101. That's our position. Okay. Thank you, Mr. Elkin. We'll hear back from Mr. Slotnick on our phone. Thank you. First of all, with respect to the Harry Weiss license, the Appendix 422, the letter says that if you wish to obtain a compulsory license to make and distribute digital photo record deliveries under the compulsory licensing provisions, there's no question here that the parties understood that this was going to be a compulsory license. Yeah, but then it says also that this license varies from the terms of the statute, right? It does. So they could call it whatever they want, but they're not following all of the statutory requirements. That may be, but the parties still understood this. And I think that I probably should have used a better example than Judy Garland. I could have used another classic movie, West Side Story. Natalie Wood never signed a song. Not one. And it couldn't sing. Well, I don't think that the defendant's position is that you wouldn't need a license if you were, in fact, synchronizing some other song to the video, right? This is really sort of the problem, I think, with where this case ended up. Yes, you would need a license. One way or another, you need to get a license. The question is, you need to negotiate that license on a sum-by-sum basis where possibly the answer to that is going to be no, or possibly the answer is going to be, sure, you can do it, but it's not going to be at nine cents. It's going to be at $100 or $1,000 or $10,000. And I think the problem with where this case ended up, especially with the courts' rulings and because of COVID, is that the jury thought that this case was an underpayment case. It wasn't an underpayment case. It was a rights case. There is no question here that the defendants were arguing that there were five boxes of documents. Without showing one of those documents, and without the jury ever looking at those documents, that they thought, these are two parties who are fighting over the difference between a dollar and nine cents. That's not what this is. It's not what this is. It never is. Mr. Slotnick, before you sit down, what about the personal liability, Mr. Sagan? What's the hook for him? The hook is he was the driving force behind this. Well, corporate officers are driving forces behind lots of aggressive corporations. Was this an ultra viris act by a corporate officer, or is this just a corporate officer telling his company to go and make some money? I think he did more than that because he was – everything he did was a volitional event. Well, sure, but corporate officers do volitional things all the time, but they don't incur personal liability for it if they're acting in the interest of the corporate entity. The corporate entity owned these works, right? Yes. All right. So how is he personally liable? Mr. Sagan was a trucking company and drove his truck while drunk and ran over three people. The company would be liable, and he would be liable, too, because he was the one who committed the tort. This is what happened. Well, you said while drunk, and that's an ultra viris act, and you haven't pled ultra viris, and that's why I specifically asked it. But if he drove that truck and he wasn't drunk and he was doing it within the scope of his employment, his corporation would reimburse him, and he wouldn't incur personal liability in the sense that the corporation would be vicariously liable for anything he did. I think we get into some gray areas when we start talking about different types of copyright infringement. All right. That dealing with— What's your best case? Just give me your best case that I should read for Mr. Sagan to be personally liable. I haven't looked for it yet, sir. You've got a great co-counselor. I have a wonderful co-counselor. He deserves a raise. I'll take it back to the— Please do. You can quote me. I'll take it. Stoat v. Drug Entertainment. Stoat v. Gardner? Yes, and that was a decision made on by Judge Chen when he was in opposition to the court. Very good, Judge. Thank you. And Dr. Randall and I— Okay, well, unless there are other questions? No, thank you. Thank you, Mr. Slotnick. The case is submitted. And because that is our only argued case for today, we are adjourned. Thank you both.